# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3072-23

B.F.,

      Plaintiff-Respondent,

v.

F.W.F.,

      Defendant-Appellant.

_____

Submitted May 7, 2025 – Decided July 3, 2025

Before Judges Currier and Marczyk.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FV-04-2723-24.

Rosenberg, Perry & Associates, LLC, attorneys for appellant (Katherine Constantine Blinn, on the briefs).

Donelson, D'Alessandro & Peterson, LLC, attorneys for respondent (Linwood H. Donelson, III, on the brief).

PER CURIAM

Defendant F.W.F. appeals from the April 24, 2024 final restraining order (FRO) entered against him under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, after a trial. On appeal, defendant contends the trial court failed to make any findings of (1) a predicate act of domestic violence to support the entry of an FRO; and (2) whether plaintiff needed an FRO for her safety as required under Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006). Because the trial court did not make the requisite findings, we vacate the FRO.

I.

We derive the following facts from the trial testimony. The parties met in high school and were together for approximately thirty years. They were married for the last twenty years of their relationship. The parties lived together in Florida.

Plaintiff testified that on June 4, 2022, she came to New Jersey to visit her grandmother and decided to leave defendant and move to New Jersey permanently because she was "afraid to go home."

Defendant testified that plaintiff had started talking about a divorce in February 2022. He stated that when plaintiff went to visit her grandmother in New Jersey, she told defendant she was going on a vacation, and he did not know

2

she was not returning to Florida. In July 2022, defendant started a new job and relocated to Tennessee.

Plaintiff testified that for the first two months after she left Florida, defendant contacted her "every day, multiple times a day." She stated there were hundreds of calls and she eventually got a new phone. Defendant stated he was contacting plaintiff during this time to confirm whether she was returning to Florida or pursuing a divorce. Defendant also testified that plaintiff was sending him derogatory messages which caused him to change his phone number in October 2022. After he did so, he said he no longer had plaintiff's phone number. Thereafter, there was no contact between the parties and they did not communicate until late 2023 or early 2024.

Plaintiff stated she received a message sent by defendant through the application "reddit" in February 2024. She did not present a copy of the message and did not testify to its substance. Defendant contested this testimony, stating plaintiff initiated contact by sending him a message on reddit. He stated that, shortly after, plaintiff sent him numerous derogatory messages and he then deleted his reddit account.

Plaintiff then contacted defendant on another application—"Telegram." She testified she "sent him a message telling him what he's done to [her] in the

3

past." The parties then exchanged a series of messages, in which plaintiff expressed her feelings regarding alleged past abuse by defendant, calling defendant, among other things, a "monster" that had "disfigured" her, and a "cheating bastard," and told him she had a boyfriend. Defendant responded, stating among other things, "I don't care anymore," "[g]lad you are in love. Hope it lasts. I wish you the best," "[I] would die for you," and sending a picture of a tattoo of her name on his arm.

On February 15, 2024, plaintiff received the following message from defendant:

> Good morning [B.],
>
> I sent you a link to send you . . . $1,000 for your filing/court fees. If that is not enough let me know.
>
> I'll send you the money when you tell me.
>
> I wish you endless happiness and boundless adventures.
>
> I will always love you [B.].

Plaintiff acknowledged she received the money but did not respond to defendant who asked for confirmation of her receipt.

Plaintiff stated she received approximately 250 phone calls and twelve voicemail messages from defendant from six different phone numbers on February 28 and 29. She testified that two of the numbers came from New Jersey

4

area codes, which caused her to fear that defendant was "coming after" her to kill her because he had threatened to kill her in the past. Further, she stated that some of the calls came from two other individuals calling on behalf of defendant—a male and a female—who each called her about three times and left voicemails. Plaintiff did not answer or return any of the calls. She testified that, in the voicemails, defendant and the friends were asking if she intended to file for divorce and whether she received the money.

Two of the voicemails were played at the hearing. None of the voicemails were admitted into evidence. They are not in the appellate record.

Plaintiff's boyfriend, J.A., testified that defendant also called him several times on February 28 and 29, 2024, with the same five or six phone numbers used to call plaintiff. Defendant also sent J.A. numerous text messages, photo messages, and voice messages with aggressive and derogatory language and images. The context of the messages can be summarized as challenging J.A. to pick up the phone, calling him things like a "chump," a "pussy," a "pedophile," and telling him to "[b]e ready for a f[***]ing hurricane." Defendant stated in one of the voicemails, "[I know] where you're at [a]nd you have a problem. . . ." He also said, "I am not being threatening towards you."

A-3072-23

J.A. applied for and received a temporary protective order against defendant under the Victim's Assistance and Survivor Protection Act (VASPA), N.J.S.A. 2C:14-13 to -21. At the time of trial, the VASPA order had not been served on defendant. According to defendant's counsel, the VASPA order was subsequently dismissed after a hearing.

Defendant testified that he used a "text through message app" that masked his phone number and assigned new phone numbers because he "figured" J.A. would not answer. Defendant stated the reason for the voluminous amount of calls was that he "had a couple of drinks that night and . . . got carried away." He expressed regret at making the calls and for what he said to J.A. in the voicemails and text messages. Defendant testified that the purpose of his phone calls was to tell plaintiff that he wanted her to file for divorce.

Defendant testified he had not seen plaintiff in more than two years. He had not come to New Jersey and did not intend to do so. Defendant continued to live in Tennessee and was contemplating a move to Idaho.

Plaintiff also testified regarding allegations of past abuse by defendant while the two were still together: (1) on one occasion after plaintiff left an iron on, defendant whipped her with the cord of the iron several times and put the iron up to her face so she would feel the heat and told her to never leave it on

6

again; (2) defendant gave plaintiff twenty to twenty-five "severe beatings"; (3) defendant had strangled plaintiff twenty to twenty-five times, causing her to lose consciousness six times; (4) defendant threatened to kill her and kill himself several times; (5) plaintiff was not allowed to have friends; (6) defendant would make a slashing motion on his neck with his hand when someone would sit next to her which made her move from the spot; (7) on one occasion defendant smashed plaintiff's head against the passenger side window of a car; (8) defendant would physically force plaintiff to sit up straight if she was slouching; (9) in October 2021, defendant twisted both of plaintiff's hands so severely that she passed out, later could not drive to work, and caused permanent disfigurement in her fingers; (10) defendant has anger issues; (11) defendant has a history of alcohol abuse and plaintiff believed defendant sounded inebriated on the voicemails he left her; and (12) on one occasion plaintiff's daughter called the police because defendant was beating plaintiff but before the police arrived, defendant made her cover her bruises with a long-sleeved shirt.

A-3072-23

Plaintiff testified that because of these events she has been diagnosed with post-traumatic stress disorder and Stockholm Syndrome[1] and goes to therapy to deal with anxiety attacks.

Plaintiff conceded during cross-examination that: (1) in some of the voicemails defendant was inquiring whether plaintiff was filing for divorce; (2) she does not have any photographs of the alleged injuries caused by defendant; and (3) there are no police reports documenting the alleged abuse.

Defendant denied all allegations of abuse and stated plaintiff hurt her fingers in a door when the two were arguing in a bathroom. Defendant said plaintiff was a "heavy marijuana user" and verbally and physically abusive with him, and on that occasion, plaintiff cornered him in the bathroom. He said plaintiff punched him three or four times on the top of his head, held a tongue scraper to his temple and said she was going to kill him. Defendant stated he did not see how plaintiff injured herself but believed it was when he turned to get out the door because she was grabbing his shirt.

In an oral decision issued after trial on April 24, 2024, the court found that "overwhelmingly, without question . . . plaintiff [was] a more believable

---

[1] Stockholm Syndrome is "the psychological tendency of a hostage to bond with, identify with, or sympathize with his or her captor." Merriam-Webster's Collegiate Dictionary 1228 (11th ed. 2020) (defining "Stockholm Syndrome").

witness, especially considering [that]. . . her significant other . . . also provided testimony."

The court stated that, even though defendant resided in Tennessee, the temporary restraining order (TRO) "effectively barred . . . defendant from making contact with . . . plaintiff." The court reasoned that defendant's assertion that he was drunk when making the phone calls and that it would not recur was not a defense. The court stated that the communications only stopped because of the TRO. Therefore, the court held that plaintiff was "in substantial need of continuing protection from . . . potential future problems, from what the [c]ourt [found to be] credible evidence that there is . . . need for the restraining order . . . ." The court further determined it was necessary to add J.A. to the FRO as an additional protected party.

## II.

On appeal, defendant contends the court failed to make any findings regarding whether he committed the predicate act of harassment or whether an FRO was necessary for plaintiff's protection.

In reviewing a court's decision to grant or deny an FRO, "we accord great deference to discretionary decisions of Family Part judges," Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012), in recognition "of the

family courts' special jurisdiction and expertise in family matters." N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). "[F]indings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare, 154 N.J. at 411-12 (citing Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Hitesman v. Bridgeway, Inc., 218 N.J. 8, 26 (2014) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

The entry of a domestic violence restraining order requires a trial court to make certain findings. See Silver, 387 N.J. Super. at 125-27. The court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in [N.J.S.A. 2C:25-19(a)] has occurred." Id. at 125.

If a trial court finds a defendant has committed a predicate act of domestic violence, it next must determine if a restraining order is needed to protect a plaintiff from immediate danger or further acts of domestic violence. Id. at 126. "Although this second determination . . . is most often perfunctory and self-

evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in [N.J.S.A. 2C:25-29(a)(1) to (7)], to protect the victim from an immediate danger or to prevent further abuse." Id. at 127.

In plaintiff's application for a TRO, she alleged the predicate act of harassment. N.J.S.A. 2C:33-4 provides, in pertinent part, that:

> [A] person commits a petty disorderly persons offense if, with purpose to harass another, he [or she]:
>
> (a) Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> (b) Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> (c) Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
>
> A communication under subsection a. may be deemed to have been made either at the place where it originated or at the place where it was received.

Our Supreme Court has instructed that the harassment statute includes two separate analyses based on the facts alleged that may result in the offense. J.D.

v. M.D.F., 207 N.J. 458, 477 (2011). A violation of subsection (c) "requires proof of a course of conduct . . . that is alarming or it may be a series of repeated acts if done with the purpose 'to alarm or seriously annoy' the intended victim." Id. at 478 (quoting N.J.S.A. 2C:33-4(c)). "[S]eriously annoy" is defined as meaning "to weary, worry, trouble or offend." Ibid. (quoting State v. Hoffman, 149 N.J. 564, 581 (1997)).

A violation of subsection (a) requires a finding of the following three elements:

> (1) defendant made or caused to be made a communication; (2) defendant's purpose in making or causing the communication to be made was to harass another person; and (3) the communication was in one of the specified manners or any other manner similarly likely to cause annoyance or alarm to its intended recipient.
>
> [Hoffman, 149 N.J. at 576.]

"[A]nnoyance" is defined as to "disturb, irritate, or bother." Id. at 580. A trial judge is permitted to use their "[c]ommon sense and experience" to infer a defendant's purpose to harass from the evidence presented. J.D., 207 N.J. at 477 (alteration in original) (quoting Hoffman, 149 N.J. at 577). Further, a purpose to harass can be inferred from a history between the parties, but the "victim's

subjective reaction alone will not suffice; there must be evidence of the improper purpose." Id. at 487.

Here, the court made no findings regarding the predicate act of harassment. The court never referenced the statute and made no requisite findings regarding a purpose to harass. Instead, the court based its decision on (1) its credibility findings, stating it found plaintiff more credible than defendant; (2) finding the communications between the parties continued until the TRO was issued; and (3) that plaintiff was in substantial need of continuing protection.

Although credibility findings are critical to a trial court's issuance of an FRO, they alone are not sufficient to support a finding of a predicate act of domestic violence or a finding that an FRO is necessary to prevent further acts of domestic violence. Instead, a court must make findings of fact and conclusions of law as required under Rule 1:7-4(a).

When a trial court does not articulate precise findings of fact and conclusions of law to explain its conclusions, this court is impeded from meaningful appellate review. See Gnall v. Gnall, 222 N.J. 414, 428 (2015) ("Failure to make explicit findings and clear statements of reasoning 'constitutes

a disservice to the litigants, the attorneys, and the appellate court'"). (quoting Curtis v. Finneran, 83 N.J. 563, 569-70 (1980)).

Plaintiff concedes the court did not make any findings regarding a predicate act of domestic violence as required under the PDVA. However, she asserts this court can make the determination that she satisfied the act of harassment from the evidence presented during trial. We disagree.

We are in no position to determine whether defendant had a purpose or intent to harass plaintiff as he testified he had a legitimate reason for making the phone calls—to find out if plaintiff was filing for divorce.

Although the excessive number of phone calls could potentially constitute harassment, they occurred over only two days, after approximately a year of no contact between the parties. In addition, the record only includes the text exchange which was initiated by plaintiff and none of the referenced voicemails sent by defendant directly to plaintiff. In the only two voicemails presented at trial, defendant and his friend asked about the status of the divorce. This record does not permit us to determine whether the predicate act of harassment was proven. The trial court had to make findings regarding defendant's purpose to harass—integral to a finding of harassment. Lacking those findings, this court cannot meaningfully review the trial court's entry of an FRO.

A-3072-23

Similarly, the court did not explain why an FRO was necessary "to protect the victim from an immediate danger or to prevent further abuse" following an assessment "of the factors set forth in [N.J.S.A. 2C:25-29(a)(1) to (7)]." Silver, 387 N.J. Super. at 127. In addition to the factors discussed above regarding the limited period in which the phone calls occurred after no contact for approximately a year, defendant also resided hundreds of miles away from plaintiff.

It is unclear whether the court also considered the phone calls made to J.A. as a predicate basis for finding harassment of plaintiff or the necessity for an FRO. If so, this was improper because plaintiff must prove the harassment was intended towards her, not a third party. See M.A. v. E.A., 388 N.J. Super. 612, 619 (App. Div. 2006) (finding that harassment, for purposes of the PDVA, "logically refers to the plaintiff, and not a third party").

The FRO is vacated. We remand for the trial court to provide a comprehensive statement of its findings of fact and conclusions of law as to the predicate act of harassment and whether the FRO is necessary to protect plaintiff from immediate harm or further acts of violence. The TRO is reinstated and will remain in place pending the issuance of the trial court's decision on remand.

A-3072-23

Vacated and remanded for further proceedings in accordance with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division